**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| REGINA J. INGRAHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. 3:07-0328 |
| | ) | JUDGE HAYNES |
| PETE GEREN, ACTING SECRETARY | ) | |
| OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |

### M E M O R A N D U M

Plaintiff, Regina J. Ingraham filed this pro se action under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e-16 ("Title VII"), against the Defendant, Pete Geren, acting

Secretary of the United States Army ("Army").[1]  Plaintiff asserts claims that the Army

discriminated against her based upon her religion when she was required to forward emails that

allegedly contained religious content.  Plaintiff also asserts that the Army discriminated against

her based upon her race when the Army failed to promote her and retaliated against her after she

filed an administrative charge about the Defendant's discriminatory conduct.  The Defendant

filed an answer denying Plaintiff's allegations, and the parties proceeded with discovery.

Before the Court is Defendant's motion for summary judgement (Docket Entry No. 13),

contending, in sum: (1) Plaintiff's action is untimely; and (2) Plaintiff's claims are not actionable

under Title VII.  In response (Docket Entry No. 16), Plaintiff contends: (1) that her action was

timely filed, or in the alternative, the doctrine of equitable tolling should apply;(2) her claims are

_____

[1] Plaintiff originally filed this action against Dr. Francis J. Harvey, Secretary of the
Department of the Army.  By operation of Federal Rule of Civil Procedure 25(d)(1), Acting
Secretary Geren is automatically substituted as the properly named Defendant in this action.

actionable under Title VII because she was qualified for the position in question; and (3) she was subjected to hostile work environment based upon her religion.

## A. FINDINGS OF FACT[2]

Ingraham, an African American woman of nondenominational faith was employed as a support services clerk, GS4.  (Docket Entry No. 14, Transcript of Fact Finding Conference at pp. 13, 18).  Ingraham, a federal civilian employee since October 23, 2000 and has worked as a support services clerk, GS4 since some time in 2001.  Id. at p. 13.  During her employment as a support services clerk, Ingraham's supervisor was Sergeant First Class Tester ("SFC Tester"), the Non-Commissioned Officer In Charge ("NCOIC") of Medical Services, and his supervisor was Lieutenant Colonel Littleton, the Chief of the Department of Medical Services ("Dr. Littleton"). Id. pp. 14, 15.

Ingraham's major responsibilities as a support services clerk "included travel, processing employees in and out of the Department of Medical Services and covering for the Department of Medical Services Secretary."  Id. at p. 14.  In the event Ingraham had to cover for the Department of Medical Services secretary, she might process employees, answer the telephone, author memoranda, keep minutes of meetings, etc..  Id. at p.15.  In addition to the Department of Medical Services secretary's administrative duties, Ingraham might also fill in as secretary for

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment.  Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion).  As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery.  Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).  Because there are not material factual disputes, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

2

Dr. Littleton.  Id.

During Ingraham's employment, SFC Tester, Lieutenant Colonel Goulart ("LTC Goulart"), Lieutenant Hayes ("LT Hayes") and Dr. Littleton directed Ingraham to send daily electronic mail messages that she asserts were religious in nature.  Id. at pp. 18-19.  SFC Tester explained that Dr. Littleton requested the electronic mails be sent.  Id. at p. 19.  According to Ingraham:

> I'm sure it started in 2003, Lieutenant Colonel Goulart instructed me to send out the Thought of the Day for the Chief, Lieutenant Colonel Littleton, each morning and maybe a year later, Sergeant First Class Tester was positioned into our department and sergeant– I stopped sending them for a while thinking no one would notice they were not being sent.  When Sergeant Tester came into our department, he informed me that I would start sending them out and I would send them out daily.

Id. at p. 20.  Some time after receiving this assignment, Ingraham expressed religious-based objections to both SFC Tester and LTC Goulart.  Id.  Despite her objections, Ingraham was directed to comply with Dr. Littleton's request.

Ingraham asserts that she is not the only employee to complain about the electronic mail messages, though she does not know why the other individuals objected.  Id. at pp. 20-21.  While Ingraham voiced her concerns to SFC Tester and LTC Goulart, she never informed Dr. Littleton that she found the electronic messages offensive or that she did not wish to send them.  Id. at p. 22.  Ingraham failed to inform any other person that she deemed the emails to be offensive in nature.  Id. at pp. 23, 28.  Moreover, Ingraham contends that sending the messages changed her and the other objectors' working conditions because they all found the messages upsetting and Ingraham was worried about what she might be asked to send out the following day.  Id.  The Department ceased sending the messages in January 2005, when Ingraham stopped sending them.

3

Id. at p. 24.

Ingraham also asserts that she was denied a promotional opportunity based upon her race and as a reprisal for having previously filed an EEOC charge.[3] In 2004, a GS6 secretarial position within the Department of Medical Services became available. Id. at p. 29. Although Ingraham was interested in filling this position, it was non-competitively filled. Id. Ingraham insists that LTC Goulart, SFC Tester and Dr. Littleton said that she could apply for the position if she performed the required duties. Id. Ingraham was also informed that she could not apply until after November 9, 2004, the hiring date for that position. Id. On December 29, 2004, Ms. Cooper, a white GS6 employee, informed Ingraham that she had been selected to laterally transfer into the vacant position. Id. at pp. 29-30. According to Ingraham, Cooper did not work as a secretary, rather she worked in budget and retirement. Id. at p. 37.

Although Ingraham did not work with the Army as a secretary, she believes her qualifications to be superior to Cooper's because previously, Ingraham had been a secretary for 20 years and an office manager for three. Id. at p. 38. Ingraham alleges Ms. Cooper's selection to be discriminatory because:

> I had performed the secretarial duties for four years for Mrs. Crawford because she was– had a chronic sickness, so I performed the duties. I performed the duties fully from June 24th until December the 28th and Miss Cooper was laterally transferred into the position. She had no idea of any of the duties. I had to train her. When I refused to train her anymore, they had– they had Mrs. Crawford to train her, but I had to learn on my own, but they bring a white female in who knows nothing about the job and because someone decided they wanted her there, I was just pushed aside after performing the duties.

---

[3] Plaintiff filed an EEO charge that was withdrawn in July 2004. Plaintiff had also filed an EEO charge some time in 2002. See Docket Entry No. 14 at Exhibit 8 thereto, EEO Counselor's Report at p. 2.

4

Id. at p. 33. Although there was a two-level difference between Ingraham, a GS4 and Cooper, a GS6, Ingraham alleges that two-level promotions have occurred before. Id. at pp. 34-35. According to Ingraham, Terry Grimes and Jolene Shore, both white, were non-competitively promoted two levels because they had been performing the duties of the vacant positions. Id. While Ingraham believed her non-selection to be discriminatory, she did not speak with upper level management about her treatment, rather she voiced her concerns to an EEO counselor and SFC Tester. Id. at p. 39.

In support of her argument that the denial of the promotional opportunity was retaliatory, Ingraham asserts that leadership was upset with her for filing an EEOC charge. Ingraham "was told by Lieutenant Colonel Littleton that I should choose my battles wisely when [she] went to him to apologize for filing the EEO complaint." Id. at p. 30. Ingraham interpreted this statement to mean that she "shouldn't have filed and [Dr. Littleton] was going to make my life miserable while [she] was at work." Id. Ingraham spoke with Master Sergeant Malloy ("MS Malloy"), her then supervisor, to discuss the legality of the selection process. Id. at p. 31. MS Malloy "stated that Lieutenant Colonel Littleton wanted Miss Cooper there so that's why she was there." Id. Pam Elston, an employee in the personnel department told Ingraham that "when it comes down to it, the chief of the department has the final decision who he wants as his secretary." Id. Yet, Dr. Littleton alleges he had nothing to do with Cooper's selection and, in fact, did not know her personally until she assumed the role of department secretary. Id. at pp. 62-63, 69. Shortly after Cooper's selection, Ingraham took her concerns to Maryann Robinson, an EEO counselor, who assisted Ingraham in filing an administrative complaint. Id. at p. 31.

## B. CONCLUSIONS OF LAW

5

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

6

Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of

the need for additional discovery after the filing of a motion for summary judgment. Emmons v.

McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data

Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant

has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the

nonmoving party then `must set forth specific facts showing that there is a genuine issue for

trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule

56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he

7

respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must

`present affirmative evidence in order to defeat a properly supported motion for summary

judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty

Lobby).  Moreover, the Court of Appeals explained that:

> The respondent must `do more than simply show that there is some metaphysical
> doubt as to the material facts.'  Further, `[w]here the record taken as a whole could
> not lead a rational trier of fact to find' for the respondent, the motion should be
> granted.  The trial court has at least some discretion to determine whether the
> respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted).  See also Hutt v. Gibson Fiber Glass Products, No.

89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment

must determine `whether the evidence presents a sufficient disagreement to require a submission

to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting

Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute
> about a material fact is `genuine' that is, if the evidence is such that a reasonable
> jury could return a verdict for the nonmoving party.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry
> involved in a ruling on a motion for summary judgment or for a directed verdict
> necessarily implicates the substantive evidentiary standard of proof that would
> apply at the trial on the merits.  If the defendant in a run-of-the-mill civil case
> moves for summary judgment or for a directed verdict based on the lack of proof
> of a material fact, the judge must ask himself not whether he thinks the evidence
> unmistakably favors one side or the other but whether a fair-minded jury could
> return a verdict for the plaintiff on the evidence presented.  The mere existence of
> a scintilla of evidence in support of the plaintiff's position will be insufficient;

8

there must be evidence on which the jury could reasonably find for the plaintiff.
The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could
find by a preponderance of the evidence that the plaintiff is entitled to a verdict --
`whether there is [evidence] upon which a jury can properly proceed to find a
verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the
evidence in its most favorable light in favor of the party opposing the motion and
against the movant. Further, the papers supporting the movant are closely
scrutinized, whereas the opponent's are indulgently treated. It has been stated that:
`The purpose of the hearing on the motion for such a judgment is not to resolve
factual issues. It is to determine whether there is any genuine issue of material
fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company,

791 F.2d. 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

A district court is not required to speculate on which portion of the record the
nonmoving party relies, nor is it obligated to wade through and search the entire
record for some specific facts that might support the nonmoving party's claim. Rule
56 contemplates a limited marshalling of evidence by the nonmoving party sufficient
to establishing a genuine issue of material fact for trial. This marshalling of
evidence, however, does not require the nonmoving party to "designate" facts by
citing specific page numbers. Designate means simply "to point out the location of."
Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough
specificity that the district court can readily identify the facts upon which the
nonmoving party relies; but that need for specificity must be balanced against a

9

party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.    A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.    As on federal directed verdict motions, the `scintilla rule' applies,   i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

The Court must be careful when analyzing the contentions of a pro se litigant. "While a court must construe a pro se plaintiff's pleadings more liberally than pleadings prepared by an attorney, pro se litigants 'are not exempted or excused from the Federal Rules governing pleading, dismissal for failure to state claims, and summary judgment.'" Moore v. Holbrook, 2 F.3d 697, 705 (6th Cir.1993). See also McKinnie v. Roadway Express, Inc., 341 F.3d 554, 558 (6th Cir.2003) ("Ordinary civil litigants proceeding pro se, however, are not entitled to special treatment, including assistance in regards to responding to [dispositive] motions." ).

11

As a threshold matter, the Court addresses first the Defendant's assertion that Plaintiff's action was untimely filed. On March 20, 2006, the Defendant issued a Final Agency Decision regarding Ingraham's allegations in which the Army accepted the EEOC administrative law judge's prior finding that no discrimination occurred. (Docket Entry No. 14, Exhibit 13 thereto, Final Agency Decision). The final agency decision informed Ingraham that she could elect to appeal to the EEOC or to file a civil action in a United States District Court within 90 days of receiving the final agency decision. Id. at pp. 2-5. Plaintiff first appealed to the EEOC. See Complaint, Attachment thereto, Appeal at p.1. The appellate decision informed Plaintiff that she has "the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date you received this decision." Id. at p. 3. According to her complaint, Plaintiff received her "right to sue" letter on September 21, 2006. (Docket Entry No. 1, Complaint at ¶ 7). Ninety days from September 21, 2006 was December 20, 2006. Plaintiff filed this action on January 12, 2007. See Docket Entry No. 1.

On November 20, 2006, Plaintiff filed a complaint with the Metropolitan Davidson County General Sessions Court that contains the same allegations as the present action. See Docket Entry No. 14, Exhibit 14 thereto, State Court Complaint. On January 9, 2007, Plaintiff attended a hearing during which the state court judge informed her that she filed her action in the wrong court. See Id. at Exhibit No. 15, Memorandum for Record. Accordingly, the state court action resulted in a non-suit on January 9, 2007. (Docket Entry No. 13, Exhibit 14 thereto, State Court Complaint). On January 12, 2007, Plaintiff submitted a complaint and an application to proceed in forma pauperis to this Court. As the Defendant points out, "January 12, 2007 was 113 days after the [P]laintiff received her 'right to sue' letter, and three days after she was informed that she had filed her claim

12

in the wrong court." (Docket Entry No. 14, Memorandum at p. 9).[4]

> Title VII requires that a party file a civil action within ninety days of receiving a
> right-to-sue letter. See 42 U.S.C. § 2000e-5(f)(1). An individual commences a civil
> action by filing a complaint with the clerk of court, see Fed. R. Civ. P. 3, 5(e), and
> a filing fee is required of a party instituting any civil action, see 28 U.S.C. § 1914(a).
> Everyone, "[e]ven uncounseled litigants must act within the time provided by statutes
> and rules." Williams-Guice, 45 F.3d at 164.

Truitt v. County of Wayne, 148 F.3d 644, 647 (6th Cir.1998). Here, it is clear that Plaintiff failed

to file her action in a timely matter because she filed her action more than 90 days after receiving her

right to sue letter.

"The ninety-day time limitation in Title VII cases is not jurisdictional; therefore, equitable

tolling is available." Id. at p. 648 (citing Jarrett v. U.S. Sprint Communications Co., 22 F.3d 256,

259-60 (10th Cir.1994)). There are five factors to consider in determining if equitable tolling is

appropriate: 1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the

filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant;

and 5) the plaintiff's reasonableness is remaining ignorant of the particular legal requirement. The

propriety of equitable tolling must necessarily be determined on a case-by-case basis. Id. (citations

omitted).

Here, Ingraham insists that the right to sue letter's directions on filing a civil action were

unclear and she was unaware that there are two court houses in Nashville, Tennessee. (Docket Entry

---

[4] The Sixth Circuit has held that "a complaint is filed when it along with an application
to proceed in forma pauperis are presented to the clerk's office and the clerk's office takes
possession of the complaint and the application is granted, notwithstanding the fact that the
complaint is not formally stamped filed." Dean v. Veterans Admin. Reg'l Office, 943 F.2d 667,
671 (6th Cir.1991), vacated and remanded on other grounds, 503 U.S. 902, (1992). The Court
granted Ingraham's application to proceed in forma pauperis on January 26, 2007. See Docket
Entry No. 3, Order Granting IFP. Thus, the Complaint was deemed filed on January 26, 2007.

13

No. 16, Response in Opposition at p. 1). According to Ingraham she is entitled to equitable tolling

because:

> I contacted the Davidson County Clerks office in November 2006 for directions to
> the court house for the purpose of filing a discrimination complaint. The clerk did
> not seem surprised that I was filing a discrimination complaint with a "right to sue"
> at the Davidson County Court House.

> On January 9, 2007, I was traveling alone and afraid to search [] for the Federal
> Building. On that day, I had no extra money with me, and upset because I had filed
> with the wrong court system. I had no choice but to return to Clarksville, Tennessee.

> On January 11th at 6 p.m., I received money for gas, parking, and a fee payment to
> cover the cost of to request the filing fee be waived, I had to pay a filing fee amount
> at the Davidson County court house, even though I requested the fee be waived, some
> parts of the fees could not be waived. Therefore, I thought... I must have money for
> the Federal Building Court house."

Id. at pp. 1-2. The Court notes that Ingraham's November 2006 state court filing was within 90 days

of receiving her right to sue letter.

> Although Ingraham is representing herself in this matter, as the Supreme Court observed,

> Procedural requirements established by Congress for gaining access to the federal
> courts are not to be disregarded by courts out of a vague sympathy for particular
> litigants. As we stated in Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980), "[i]n
> the long run, experience teaches that strict adherence to the procedural requirements
> specified by the legislature is the best guarantee of evenhanded administration of the
> law."

Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984). Yet the Court may exercise

equitable tolling at its discretion when justice so requires.

The Supreme Court deemed tolling appropriate when a plaintiff attempts to vindicate her

rights during the limitations period, but fails to file proper pleadings. "Federal courts have typically

extended equitable relief only sparingly. We have allowed equitable tolling in situations where the

claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory

period." Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990). The Sixth Circuit agrees that tolling is warranted in situations where a plaintiff files an action in state court that would have been timely had it been properly filed in federal court. In Fox v. Eaton Corp., 615 F.2d 716, 720 (6th Cir.1980) the Sixth Circuit held:

> [plaintiff's] commencement of a Title VII action in state court was sufficient to toll the ninety day period within which she was required to commence a civil action... Certainly the purpose underlying the particular time period was satisfied...Throughout these proceedings, [plaintiff] has exercised great diligence, however unartfully, in pursuing her claim. Her only misfortune lay in the selection of an inappropriate forum.

Id. at 720.

> Subsequent opinions have cautioned that the Fox holding is limited in scope.

> This court has applied equitable tolling concepts in a... circumstance where the employee reasonably failed correctly to predict whether a state court would have jurisdiction and, therefore, filed in state court with the ultimate result that her claim was dismissed. Fox v. Eaton Corp., 615 F.2d 716 (6th Cir. 1980). FN2 We have cautioned, however, that the concept is not an escape valve through which jurisdictional requirements will evaporate since "(t)he tolling of the statutory periods on equitable grounds is usually very much restricted." Geromette v. General Motors Corp., 609 F.2d 1200, 1203 (6th Cir. 1979), cert. denied, 446 U.S. 985, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980).

> > FN2. Fox is specifically limited to a situation in which the plaintiff filed an action in state court within ninety days of receipt of the right-to-sue notice, the plaintiff reasonably believing the state court possessed subject matter jurisdiction.

Brown v. Mead Corp., 646 F.2d 1163, 1165 (6th Cir.1981).

Here, the Court finds that Ingraham had a reasonable basis for believing her claim was appropriately filed in state court. Ingraham asserts that she discussed her claim, to a degree, with the clerk's office at the state court and was not informed that she attempted to file her claim in the

15

incorrect forum. While this Court does not find it to be the responsibility of a state court clerk's office to instruct litigants on the rules of filing, the Court finds that it was reasonable for Ingraham to believe she was properly vindicating her rights after her complaint was accepted and filed with the state court as Tennessee has a comparable statute and the Tennessee Human Rights Commission has served as a mediation agency for the EEOC.

After weighing the other Truitt factors this Court deems equitable tolling to be appropriate in this instance. First, although Ingraham had notice that she was to file in a United States District Court, for some citizens, the lack of the distinction between a United States District Court and a State Court is not unreasonable. Second, Ingraham was diligent in pursuing her rights when she filed her action on the 60th day of the limitations period, albeit in the wrong forum. Finally, the Defendant would not be prejudiced if the Court tolls Ingraham's claims because of the record already established in this action from the various administrative proceedings. The Court concludes that Ingraham's claims are equitably tolled from until November 20, 2006 until January 9, 2007, the date she filed her claims in state court until the date she realized she filed in the wrong court.[5] Thus, this Court will consider Ingraham's claims.

### Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 requires that "[a]ll personnel actions affecting

---

[5] Defendant argues that the time that elapsed between Ingraham's notice that she filed in the wrong court and her filing her action in this Court is inexcusable. However, because the Court concludes her claims to be tolled, the additional three days Ingraham took to file in the appropriate court are inconsequential, because the "clock" was effectively stopped on the 60th day of the limitations period, giving Plaintiff 30 additional days to file in the United States District Court once the clock restarted on January 9, 2007. As mentioned in note 4, supra, her Complaint was deemed filed on January 26, 2007. After the Court subtracts dates for equitable tolling, Ingraham's Complaint was filed on the 77th day of her limitations period.

16

employees or applicants for employment be made free from any discrimination based on race, [or] religion...." 42 U.S.C. § 2000e-16. Plaintiff asserts that the Army violated federal employment laws by creating a hostile work environment based upon her nondenominational religion and that the Army failed to promote her because of her race and her prior charges of discrimination.

For a hostile work environment claim, Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). In order to establish a prima facie case of hostile work environment based upon religion, Plaintiff must establish: (1) she is a member of a protected class; (2) she was subjected to unwelcome religious harassment; (3) the harassment was based on religion; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile or offensive work environment; and (5) employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999).

Without discussing the merits of all the elements, the Court finds that Ingraham fails on the fourth prong. Harassment affects a "term, condition or privilege of employment" if the conduct is severe or pervasive enough to alter the conditions of the plaintiff's employment and creates an abusive working environment. Harris, 510 U.S. at 21-22. For conduct to qualify as having created a hostile work environment, both an objective and subjective test must be met:

> "[M]ere utterance of an ... epithet which engenders offensive feelings in a [sic] employee," Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment– an environment that a reasonable person would find hostile or abusive– is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment

17

to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris, 510 U.S. at 21-22.  To determine whether the objective and subjective tests are met, the Court must examine  the totality of the circumstances.

> [W]hether an environment is "hostile" or "abusive" can be determined only be looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance... no single factor is required.

Id. at 23.

Here, Ingraham asserts that she was directed to forward daily emails from her supervisor that contained religious references, and that she did not feel comfortable with this assignment.  To be sure, many of the emails provided in the record reference God, the Bible and include quotes from scripture.  Although Ingraham meets the subjective test, she fails to demonstrate that a reasonable person would find the act of forwarding emails on behalf of another that containing references to God, the Bible and quotes from scripture creates an objectively hostile or abusive work environment.

While the decision to author emails that include references to God and the like may have been inappropriate, when taken in context, these correspondence do not rise to the level of creating a hostile work environment.  The emails of record consist of a "word for today," a "definition" and "today's comments."  See Docket Entry No. 14, Exhibit 3 thereto, Emails.  The comments are then usually followed with daily quotes and at times, "some things your mother may have told you."  Id. For example, an email dated January 25, 2004 with the subject of "Gratitude" reads as follows:

> Word for Today: Gratitude: Demonstrate It

> Definition of gratitude: Thankfulness; appreciation; the abundant blessing of being thankful.

Today's Comments: Having gratitude helps you make every day an "attitude is everything" day. Maintaining an attitude of gratitude is the key to seeing more of God's blessing manifest in your life. Celebrate the gifts and talents that you've been given. Be thankful for the little things, and expect more goodness to come your way. Any day above ground is a good day. The fact that you have warm blood flowing through your veins and breath in your body is a reason to celebrate. A lot of people didn't make it that far, so take a deep breath and give thanks. There are so many things to thank God for that every day becomes an opportunity to acknowledge and receive more blessings. The more you begin to live a thankful life, the more you'll begin to see your blessings multiply. Make a conscious effort to thank as many people as you can today for anything, no matter how big or small. Watch the transformation that happens in your life when you continually maintain and attitude of gratitude, one that says, "Thank you, God."

Daily Quotes: "God gave you a gift of 86,400 seconds today. Have you used one to say 'thank you'?"– William A. Ward

"Joy is the simplest form of gratitude."– William A. Ward

"When you wake up and there is no chalk outline around your body, that's a good day to embrace an attitude of gratitude."– Anonymous

Some things your mother may have told you about gratitude...

       1. He who forgets the language of gratitude can never be on speaking terms with happiness.
       2. Develop on attitude for what you have– not regretful for what you don't have.
       3. Be grateful for the doors of opportunity– and for friends who oil the hinges.

Submitted by LTC Littleton. Have a wonderful day.

(Docket Entry No. 14, Exhibit 3 thereto, Email at p. 76). Although this message does contain the word "God" four times, the mere mention of the word does not create an objectively hostile work environment. Other allegedly hostile email messages are focused around "destiny" (id. at p. 78), "love" (id. at p. 80), "humility" (id. at p. 83), "setback" (id. at p. 90) and "success" (id. at p. 91) and are in a similar format that provide the reader with advice. Moreover, the emails do not target any

religion in particular, and are not condescending in tone or denigrating in nature.

While inclusion of religious references may have been a poor choice, these emails attempt to be motivational in tone, as Defendant insists, and are not hostile, as Ingraham asserts. Ingraham simply does not put forth any proof that shows these emails were objectively hostile. Thus, Plaintiff's claim for a religiously hostile work environment must fail.

### Failure to Promote Claims

#### *Racial Discrimination*

Under Title VII, an employer cannot discriminate against any individual with respect to the employee's compensation, terms, conditions or privileges of employment, because of such individual's race. 42 U.S.C. § 2000e-2(a)(1). "In a disparate treatment case, liability depends on whether the protected trait [here, race] actually motivated the employer's decision...a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

The language of Title VII "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment..." Harris v Forklift Systems, Inc., 510 U.S. 17, 20 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)).

> "A prima facie case of disparate treatment under Title VII must establish by a preponderance of the evidence that the defendant took action affecting the plaintiff's compensation, terms, conditions or privileges of employment under circumstances which give rise to an inference of unlawful discrimination... Thus, the prima facie case focuses upon the primary factual inquiries of any disparate treatment case:

20

"'[whether] the defendant intentionally discriminated against plaintiff'", and whether the employer treats people less favorably than others because of race...

Beaven v. Com. of Ky., 783 F.2d 672, 675-76 (6th Cir.1986) (internal citations omitted).

"[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." Kline v. Tennessee Valley Authority , 128 F.3d 337, 348-49 (6th Cir.1997). Yet, "[t]he direct evidence and circumstantial evidence paths are mutually exclusive...If a plaintiff can produce direct evidence of discrimination then the McDonnell Douglas-Burdine paradigm is of no consequence. Similarly, if a plaintiff attempts to prove its case using the McDonnell Douglas-Burdine paradigm, then the party is not required to introduce direct evidence of discrimination." Id. Here, Plaintiff relies upon circumstantial evidence to prove discrimination.

A plaintiff may create a presumption of discrimination when she establishes the following elements of her prima facie case by a preponderance of the evidence: (1) membership in a protected class; (2) that she suffered from an adverse action; (3) that she was qualified for the position; and (4) that she was treated differently from similarly situated people outside of the protected class. Alexander v. Local 496, Laborers' Intern. Union of North America, 177 F.3d 394, 402-03 (6th Cir.1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). If the Plaintiff establishes her prima facie case, the Defendant may offer any legitimate, non-discriminatory reason for the action, which Plaintiff may then rebut with evidence of pretext. Id. at 403 (citingHartsel v. Keys, 87 F.3d 795, 800 (6th Cir.1996). The burden at all times, remains with the PlaintiffId. Here, it is undisputed that Ingraham meets the first element of a      prima facie showing of disparate treatment. Yet, the Army contends that Plaintiff cannot satisfy the second and third elements "as she

suffered no adverse personnel action and was not a qualified candidate for the position at issue."

(Docket Entry No. 14, Memorandum at p. 19). Again, without reaching the merits, the Court finds

that Plaintiff has failed to satisfy the third prong; that she was qualified for the position at issue.

Ingraham contends that the Army discriminated against her when it failed to promote her to

an available secretarial position at the GS6 level. Ingraham alleges that she is qualified for the

position because she took on some of the secretary's duties when the secretary was not at work and

also after the secretary retired. At the time of the promotion in question, Ingraham was a GS4

employee, a classification two levels below that required of the available position. As Judy

Thomason, human resource specialist explained:

> ...What happened on that when the secretary retired, the GS318-06 retired then all
> vacancies have to go to the [] hiring committee to be approved to fill. When that one
> went forward, one proposal of what they were looking at was abolishing the position
> that Miss Debbie Cooper had occupied. That was an intermittent secretary position
> that had been established and was really no longer needed, so they were going to be
> abolishing Miss Cooper's position, and management looked at this would be a
> placement for her. So she was actually placed in the secretary position...as a
> placement in lieu of a reduction of force.

(Docket Entry No. 14, Exhibit 12 thereto, Transcript of Fact Finding at p. 82).

The proof is that regardless of what duties Ingraham performed at work, it was her

classification as a GS4 that precluded her from qualifying for the position. When asked if Ingraham,

as a GS4, have been qualified for the GS6 position, Thomason said:

> No, she would not have. And here's why, the GS 318 Secretary series is a one-grade
> interval series and so in order to progress through the grade levels of that series, you
> have to have one year of specialized experience at the next lower level, and in order
> to meet time and grade to progress, you have to have one year at the next lower level.
> Since it's a one-grade interval series, the next lower level for a GS6 would be GS5.
> If you do not have any GS5s in the organization..., then you could go down to the
> GS4 level, but there were at least two GS5 secretaries within [the department].

So if we had announced that position, then the CPOC, Civilian Personal Operations Center, at Fort Riley, Kansas would have announced it at one year at the next lower level GS5. Miss Ingraham could have applied, but she would have been rated ineligible based on time and grade and experience at the next lower level.

Id. at p. 83. Here, Ingraham simply did not have a year's experience as a GS5, and could not have qualified for the secretary position as a GS4. Even though Ingraham points to two other white employees who were promoted two-levels, she does not provide any proof regarding the interval series, and the progress of the position(s) in question. Although Ingraham asserts that she was qualified to fill the GS6 secretary position, the proof indicates otherwise. Thus, Ingraham's claim for racial discrimination must fail.

*Retaliation*

Under Title VII, an employer cannot retaliate against an employee who engages in any activity protected under Title VII. 42 U.S.C. § 2000e-3(a). Title VII's prohibition against retaliation extends to the employee's opposition to any unlawful employment practice and the employee's participation in an investigation, proceeding or hearing under Title VII. Id.

The first step in the analysis is the determination of whether Plaintiff established a prima facie case of retaliation. For that showing, Ingraham must offer proof (1) that she engaged in a protected activity (2) that the exercise of her civil rights was known to the Army; (3) thereafter the Army took an employment action adverse to Ingraham; and (4) that there was a causal connection between the protected activity and the adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000). " [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.'" Grace v.USCAR, 521 F.3d 655, 677 (6th Cir.2008) (citing Wexler v. White's Fine Furniture,

23

317 F.3d 564, 574 (6th Cir.2003)). Here, the Army does not dispute the first and second elements of Ingraham's prima facie case.

Defendant insists that Ingraham did not suffer an adverse employment action and as a result, her retaliation claim must fail. Yet, the Sixth Circuit has stated that non-selections can be deemed adverse employment actions when selection for the position could be construed as a promotion See Mitchell v. Vanderbilt University, 389 F.3d 177, 183 (6th Cir.2004) (stating "where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action."). Here, had Ingraham been selected as the secretary, she would have received a two-level increase in pay grade and classification, that would bring greater prestige. Thus, Ingraham satisfies the third prong, that she suffered an adverse employment action.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000). "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). Thus, Ingraham

24

must put forth sufficient evidence to create an inference that the Army did not select her for the GS6 secretary position *because* she filed EEOC charges and would not have done so otherwise. The Court finds that Ingraham has used the second method to show a causal connection.

The burden is minimal and the Court is required to make all reasonable inferences in favor of the nonmoving party. Here, the proof is that Ingraham "was told by Lieutenant Colonel Littleton that I should choose my battles wisely when [she] went to him to apologize for filing the EEO complaint." (Docket Entry No. 14, Exhibit 1 thereto at p.30). Ingraham interpreted this statement to mean that she "shouldn't have filed and [Dr. Littleton] was going to make my life miserable while [she] was at work." Id. The impetus for Ingraham's 2004 EEO charge was that "she had been performing the secretarial duties and wanted to be compensated..." Id. at p.17. According to Ingraham, she began performing the secretarial duties in June 2004 and stopped in December 2004 when Cooper was laterally transferred into the position. The record does not include the precise date Ingraham filed her 2004 EEO charge that was later withdrawn in July 2004. Assuming arguendo that Ingraham can show the requisite causal connection between her 2004 EEO charge and her non-selection in December 2004, she fails to establish pretext for the Army's legitimate, non-discriminatory reason for the non-selection.

Once the Plaintiff has met her burden in establishing a prima facie case of retaliation, it is up to the Defendant to provide legitimate, non-discriminatory reasons for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Barnett v. Department of Veterans Affairs, 153 F.3d 338 (6th Cir. 1998). If the Defendant is able to show legitimate, nondiscriminatory reasons for the adverse employment action, the burden of persuasion returns to the Plaintiff to demonstrate that the reasons offered by the Defendant were pretextual. Id.

25

According to Defendant, Ingraham was not selected for the GS6 secretarial position because it was non-competitively filled and because she was not qualified for the position. Upon this showing of a legitimate, non-discriminatory reason, the burden shifts back to Plaintiff to show that Defendant's proffered reason for the non-selection were pretext for unlawful retaliation. It is here that Plaintiff's claim fails. Ingraham puts forth no evidence showing that the position was competitively filled (that applications were solicited), rather than non-competitively (through a lateral transfer). Moreover, Ingraham does not demonstrate that the proffered reason was pretextual because she does not show that she was qualified for the position that ultimately went to Cooper. Ingraham's assertions that she was in fact qualified for the job do not overcome Thomson's testimony that Ingraham, as a GS4 was ineligible for the secretarial position at the GS6 level.

## CONCLUSION

The Court concludes that Plaintiff has failed to establish her prima facie case of religious and racial discrimination. Although Plaintiff has met her burden of establishing a prima facie case of retaliation, the Defendant presented a legitimate, nondiscriminatory reason for its action, for which Plaintiff did not establish pretext. Thus, Defendant's motion for summary judgment should be granted.

An appropriate Order is filed herewith.

ENTERED the 19th day of August, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

26